IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TRANSCONTINENTAL REALTY INVESTORS, INC., et al., Plaintiffs, | § § § § | |
| v. | § § | No. 3:26-CV-694-O-BW |
| DANIEL J. MOOS, Defendant. | § § § | |

## MEMORANDUM OPINION AND ORDER

On May 1, 2026, Plaintiffs Pillar Income Asset Management, Inc. ("Pillar") and Transcontinental Realty Investors, Inc. ("TCI") filed a Motion to Disqualify Mark Johansen and the Firm of Blank Rome LLP ("Blank Rome"), later refiling it as a Motion to Disqualify (Dkt. No. 51 ("TCI Mot.")) with Brief (Dkt. No. 52 ("TCI Br.")) and Appendix (Dkt. No. 53 ("TCI App.")) in support. Plaintiffs Villager FWB Apts, LLC ("Villager FWB"), Farnham Park PATX, LLC ("Farnham PATX"), and Bradford Phillips (collectively, "Liberty Parties") filed a separate Motion to Disqualify Johansen and Blank Rome on May 2, 2026, later refiling it as a Motion to Disqualify (Dkt. No. 54 ("Lib. Mot.")) with Brief (Dkt. No. 55 ("Lib. Br.")) and Appendix (Dkt. No. 56 ("Lib. App.")) in support.

On May 15, 2026, Defendant Daniel J. Moos filed a Response (Dkt. No. 35 ("Resp. to TCI")) with Appendix (Dkt. No. 36 ("Def. App.")) in support addressing Pillar and TCI's Motion to Disqualify as well as a separate Response (Dkt. No. 37 ("Resp. to Lib.")) to the Liberty Parties' Motion to Disqualify. On May 16, 2026,

Intervenors Renata Petryliene and Big River NV, LLC ("Big River NV") (collectively, the "Petryliene Parties") joined and adopted in full both of Moos's Responses. (*See* Dkt. No. 39.) The Petryliene Parties also filed a Response of their own to Pillar and TCI's Motion to Disqualify, later refiling it as a Response (Dkt. No. 65 ("Int. Resp.")) with Appendix (Dkt. No. 65-1 ("Int. App.")) in support. On May 18, 2026, Pillar and TCI filed a Reply, later refiling it as a Reply (Dkt. No. 63 ("TCI Reply")) with Appendix (Dkt. No. 64 ("Reply App.")) in support. The Liberty Parties filed a Reply (later refiled as Dkt. No. 66 ("Lib. Reply")) that same day. On May 20, 2026, Chief United States District Judge Reed O'Connor referred this case to the undersigned magistrate judge to determine all non-dispositive motions and to issue findings, conclusions, and recommendations on all claim dispositive motions. (Dkt. No. 48.)

Based on the relevant filings and applicable law, Plaintiffs' Motions to Disqualify Johansen and Blank Rome are **DENIED**.

## I. BACKGROUND

This case is, at its heart, an effort to prevent an unfavorable witness from completing his unfinished deposition in a pending lawsuit playing out in state court. The undersigned has endeavored to resolve the instant motions despite numerous challenges presented by the parties' briefing. The filings in this case are riddled with inaccurate citations, seemingly deliberate misrepresentations of guiding caselaw and the factual record, failures to comply with Court rules, and, in at least one instance,

advocacy using caselaw that does not exist,[1] likely the result of imprudent reliance on a generative artificial intelligence tool.  The parties have asked that these motions be considered on an expedited status, (TCI Br. at 24), and the Court has done so despite the volume of pending matters on its docket and the impediments to efficient resolution foisted upon it by the parties' briefing.  The Court asks in return that, going forward, the parties treat this case with a degree of professionalism and care commensurate with the urgent threats to the integrity of the judicial process they repeatedly assert are at stake.

This section sets out at length the facts of the case.  It is a detailed account, but the Court considers it necessary to establish as complete a timeline of directly relevant events as possible, for the immediate resolution of the present motions to disqualify as well as the future determination of the other motions still pending in this case.

## A.    The Parties, Moos's Termination, and Subsequent Litigation

Pillar is a management entity, created to oversee three principal publicly traded companies that engage primarily in the commercial real-estate business.  (*See*

---

[1] (*See* Int. Resp. at 14 (citing *Aetna Health Inc. v. Health Goals Chiropractic Ctr., Inc.*, No. 3:12-CV-2587-O, 2012 WL 12873819, at *1 (N.D. Tex. Oct. 25, 2012) (O'Connor, J.))).  The Court notes the existence of a case by the same name, *Aetna Health Inc. v. Health Goals Chiropractic Center, Inc.*, No. 10-5216-NLH-JS, 2011 WL 1343047 (D.N.J. Apr. 7, 2011), but that case provides no support for the assertion made in the brief.  The Court notes that the attorney who signed the brief, and thus made certain representations under Fed. R. Civ. P. 11(b), is appearing pro hac vice, and it admonishes counsel about the responsible use of generative artificial intelligence in court filings.  *See Shelton v. Parkland Health*, No. 3:24-CV-2190-L-BW, 2025 WL 3141108, at *3 (N.D. Tex. Nov. 10, 2025).

Int. Resp. at 2; Int. App. 304.)  TCI is one such company.  (Int. App. 304.)  Pillar

"advises" these companies via administrative services agreements, supplying Pillar

personnel to manage all company operations.  (*Id.*)  TCI has no independent

employees of its own; it is staffed by employees, officers, and directors of Pillar.  (*Id.*

14, 304.)  TCI holds investment properties through wholly owned single-asset,

bankruptcy-remote entities[2] ("SABREs").  *Basic Capital Mgmt., Inc. v. Dynex*

*Commercial, Inc.*, 348 S.W.3d 894, 896 (Tex. 2011).  Each SABRE holds a single

property, existing with no employees or office space but those of its parent company,

TCI, which in turn has no employees or offices distinct from its "manager" Pillar.

(*See* Int. Resp. at 2; Lib. App. 5.)

Moos and the Petryliene Parties allege that, since August 2019, both TCI and

Pillar have ultimately been controlled by Bradford Phillips through his status as a

beneficiary of the May Trust, originally established by his father Gene.  (*See* Dkt. No.

11-7 at ECF 31; Int. App. 12.)  Phillips does not specifically dispute this, but he

admits only that he is "affiliated" with "Pillar and TCI and their affiliates."  (Lib.

App. 6.)  Pillar and TCI identify him as "[a]dvisor to [the] majority shareholder of

TCI."  (Int. App. 198.)  Phillips is also the CEO and Chairman of the Board of

Liberty Bankers Life Insurance Company ("LBLIC"), a Texas-based insurance

company that conducts business under the brand of Liberty Bankers Insurance

Group ("LBIG").  (Lib. Br. at 2.)  In 2020, LBLIC formed two SABREs for the

---

[2] Also known as single-purpose entities ("SPEs").

purpose of acquiring, as investment properties, two apartment complexes—Villager FWB for the purchase of Villager Apartments in Fort Walton Beach, Florida, and Farnham PATX for the purchase of Farnham Park Apartments in Port Arthur, Texas. (*Id.* at 5; Int. App. 24, 26.) Phillips is the "sole manager" of both Villager FWB and Farnham PATX. (Lib. Br. at 5.) Like other SABREs, Villager FWB and Farnham PATX have no employees of their own; all "administration and business operations of both entities are conducted by LBLIC." (*Id.*)

Moos served as President and CEO of Prime Income Asset Management, Inc. ("Prime") and its successor company Pillar from March 2007 to August 14, 2020. (TCI Br. at 3.) Moos also served as an officer and director of TCI during this same period. (*Id.*) While at Pillar, Moos preferred to keep hard copies of his business records, routinely printing electronic documents or communications and organizing them into his filing system. (TCI App. 60; Def. App. 42.) Moos was terminated from his positions at Pillar and TCI in August 2020 but retained access to his office until November 20, 2020, at which point Pillar's HR director Chris Childress boxed up all physical documents that remained in Moos's office and locked them away. (TCI App. 60–61.) On March 23, 2021, Pillar General Counsel Mark Cooper reviewed these boxes of documents. (*Id.* 61.) Cooper asserts that, in this review, he removed all attorney-client privileged communications as well as "the few files" pertaining to the business operations of Pillar and TCI. (*Id.* 61.) The remaining files were picked up by Moos's assistant Jennifer Smoak on March 30, 2021. (*Id.* 61.)

Following his termination, Moos became embroiled in three distinct lawsuits in Texas state court involving Pillar, TCI, Phillips, or other affiliated parties. Moos filed suit in the first case, *Moos v. Prime Income Asset Mgmt., LLC*, No. DC-20-17668 (160th Dist. Ct., Dallas County, Tex.) (the "Pillar Lawsuit"), on November 25, 2020, bringing a claim for breach of his employment contract against Pillar and Phillips. (Resp. to TCI at 2.) The second case, *HGH Residential, LLC v. HGH Invs., LLC*, No. DC-22-16983 (192nd Dist. Ct., Dallas County, Tex.) (the "HGH Lawsuit"), was filed on December 9, 2022. (*Id.* at 3.) The plaintiffs in this case—entities owned and operated by Moos, but not Moos himself—sued Phillips, among others, for conversion of millions of dollars' worth of real property. (*Id.* at 3.) The third case, *ABC Land & Dev. Inc. v. Moos*, No. DC-23-00403 (68th Dist. Ct., Dallas County, Tex.) (the "ABC Land Lawsuit"), was filed on January 10, 2023. (*Id.* at 3.) In this case, a Phillips-related entity named ABC Land & Development, Inc. ("ABC Land"), later joined as a plaintiff by TCI and Phillips, sued Moos for breach of fiduciary duty. (*Id.* at 3.) Moos then brought counterclaims for fraud and indemnification. (Resp. to TCI at 3.)

In January 2024, the Pillar Lawsuit was tried, resulting in a $22,000,000.00 jury verdict in Moos's favor. (*Id.* at 2.) Pillar and Phillips filed an appeal soon thereafter. (*Id.* at 2.) In all the foregoing proceedings, at all stages of litigation, Moos and the Moos-related entities were represented by attorney Mark Johansen. (TCI Br.

at 5.)  Johansen began representing Moos while at the law firm of Reed Smith LLP; he moved to Egan Nelson LLP at some point in 2024.  (*Id.*)

## B.      The Petryliene Lawsuit and the Contested Deposition

Renata Petryliene is a Lithuanian immigrant who first became acquainted with Gene Phillips in 2008 while working as his therapist.  (Int. App. 15–16.)  Over the course of the next decade, Petryliene entrusted significant funds with Gene Phillips for investment in various Pillar-managed entities and companies.  (*Id.* 20.)  In 2015, at the urging of Gene Phillips, Petryliene formed Big River NV for the purpose of purchasing the Villager Apartments located in Fort Walton Beach, Florida.  (*Id.* 24.)  In 2018, once again following Gene Phillips's advice, Petryliene formed another entity, Big River Farnham, LLC ("Big River Farnham"), for the acquisition of the Farnham Park Apartments located in Port Arthur, Texas.  (*Id.* 26–27.)  Gene Phillips passed away in August 2019, and in September 2020, Petryliene, Big River NV, and Big River Farnham filed a lawsuit against Bradford Phillips, Villager FWB, Farnham PATX, and other related parties.  (*See* Int. Resp. at 1.)  The claims in that case, *Petryliene v. Phillips*, No. DC-20-12534 (191st Dist. Ct., Dallas County, Tex.) (the "Petryliene Lawsuit"), are largely concerned with the disputed ownership of the Villager and Farnham Park apartment complexes.

Moos was at his home in Mandeville, Louisiana, on April 29, 2024, when he was personally served with a subpoena duces tecum summoning him to Dallas to sit for a deposition and produce all records he had relating to Petryliene or the

underlying claims of her lawsuit.  (*Id.* at 5; Int. App. 52.)  On July 23, 2024, defendants in the Petryliene Lawsuit—which at that time included Phillips but not TCI or Pillar—received notice of Petryliene's intent to take Moos's deposition on September 17, 2024.  (Int. Resp. at 5.)  Complying with the subpoena, Moos combed through his paper files for relevant records and made pre-deposition document productions on August 23 and September 9, 2024.  (*Id.* at 5; TCI Br. at 7.)  Both productions were transmitted to all counsel in the case by Johansen and his then-firm Egan Nelson; some of the produced documents were partially redacted.  (Int. Resp. at 5–6; Resp. to TCI at 8.)

At his September 17, 2024, deposition, Moos gave testimony regarding his paper records, explaining that all the documents he produced for the proceeding came from "16 [or] 17 bins of papers and files" in his possession—bins he estimated contained "about 40 folders" of documents each.  (Def. App. 42.)  Moos explained that he created this paper filing system while at Pillar and that, for the length of his tenure, the records remained in his Pillar office.  When Moos was locked out following his termination, he had no access to any of his documents until his assistant was able to coordinate with Pillar in March 2021 to retrieve the files that had been boxed up and locked in his office.  (*Id.*; TCI App. 61.)  According to Moos, the large volume of material that Pillar voluntarily returned to him in March 2021 comprises the vast majority of the papers stored in his 16 or 17 bins.  (Resp. to TCI at 4–5.)  Moos also contends that "several thousand of these documents" had by 2024

already been produced and shared with Pillar, TCI, and other related parties in one or more of the ongoing lawsuits in which they were engaged. (*Id.* at 5.)

Explaining why certain produced documents contained redactions, Johansen made the following statement on the record at Moos's deposition:

> [B]y the way we made this, we, Mr. Moos, made this document production for the benefit of other counsel in the room. The redactions were made by us because they purported or appeared to us to be attorney-client communications. Pillar lawyers talking to Pillar or TCI lawyers. That's just FYI. That's what the redactions are.

(Def. App. 45.) Pillar and TCI were not yet parties to the Petryliene Lawsuit when this statement was made. (TCI Br. at 8.) None of the other attorneys attending the deposition, including Mitchell Madden in his representation of Phillips, raised an objection or voiced a concern regarding the productions, the redactions, or potential attorney-client privilege issues. (*See* Def. App. 3; Int. Resp. at 6.) The deposition recessed that afternoon, and the parties agreed to reconvene at an undetermined date for the completion of the deposition. (Int. Resp. at 6–7.)

At the beginning of October 2024, Johansen began representing Petryliene and Big River NV, serving as their local counsel in the Petryliene Lawsuit. (*See* Dkt. No. 11-9.) The Petryliene Parties then moved to add Pillar and TCI as necessary parties to the Petryliene Lawsuit on October 17, 2024. (Def. App. 18–19.) On October 23, Don Swaim, serving as counsel for TCI and Pillar, wrote Johansen a letter stating his clients' belief that, under the standards articulated by the Supreme Court of Texas in *In re Meador*, 968 S.W.2d 346 (Tex. 1998), and *In re RSR Corp.*, 475 S.W.3d 775 (Tex.

2015),  Johansen was disqualified from representing the plaintiffs in the Petryliene

Lawsuit for "reviewing and producing documents" during the Moos deposition

"which you were aware contained the attorney-client privilege information of my

clients."  (*Id.* 6–7.)  The letter closed with a demand that Johansen immediately

return all privileged documents in Moos's possession and cease his representation of

the Petryliene Parties.  (*Id.* 7.)  Johansen wrote a detailed response letter on October

29, refuting his disqualification under Swaim's cited precedents and explaining the

process by which Moos's produced documents had been redacted.  (*Id.* 8–17.)

According to Johansen, Moos sent all relevant documents to Johansen's then-firm

Egan Nelson, where firm personnel reviewed the material solely to "identify[ ]

whether attorneys appeared as senders, recipients, or on the CC line of the emails."

(Resp. to TCI at 8.)  Out of caution, any message sent or received by an attorney was

redacted in its entirety, without review or analysis of its substance.  (*Id.*)  Johansen

wrote that he was not personally involved in the redaction process and that no

individual at the firm could have learned privileged information under the procedure

they followed.  (*Id.*; Def. App. 11.)

Swain wrote back on November 1, 2024, once again requesting Johansen's

withdrawal from the Petryliene Lawsuit and the return of all documents belonging to

Pillar and TCI.  (Def. App. 18–20.)  Referencing Petryliene's October 17 motion to

add Pillar and TCI to the case, Swain stressed that his clients were not parties to the

Petryliene Lawsuit but promised that, were they to be added, they would

"immediately file a motion to disqualify" Johansen from the case. (*Id.* 18–19.)  On November 4, TCI filed its Third Amended Petition in the ABC Land Lawsuit, introducing new allegations specifically contradicting Moos's telling of how he obtained his "16 [or] 17 bins" of files. (Dkt. No. 11-7 at ECF 47–48.)  Referring to these bins as "shadow files" or a "shadow archive" for the first time, TCI contended that there were few hard copy files left in Moos's office after he was locked out in November 2020, none of which concerned Pillar or TCI.  (*Id.* at ECF 48.)  Because Pillar had returned to Moos such a small volume of documents in March 2021, the redacted, potentially privileged communications he produced at his 2024 deposition—as well as the "16 [or] 17 bins" of files from which they were sourced— must have been improperly taken by Moos without Pillar's knowledge or consent. (*Id.* at ECF 48.)  This Third Amended Petition brought new claims against Moos for conversion, statutory theft, and misappropriation of trade secrets. (*Id.* at ECF 48.) On November 19, Johansen responded to Swain's November 1 letter, maintaining that the documents in question had all been voluntarily handed over to Moos by Pillar.  (Resp. to TCI at 11.)

On March 19, 2025, Madden, representing Phillips in the Petryliene Lawsuit, emailed Johansen seeking dates for the completion of Moos's deposition.  (Dkt. No. 11 at 4.)  Madden followed up on April 10, 2025, once again seeking dates to schedule the completion of Moos's deposition.  (*Id.*)  In the ABC Land Lawsuit, Pillar filed a motion to compel the production of all documents in Moos's 16 or 17

bins on April 29, 2025.  (*See* Dkt. No. 11-12.)  The court denied that motion on May 19.  (*See* Dkt. No. 11-6.)  On June 26, 2025, Madden sent a formal letter to Johansen requesting dates when Moos would be available for the completion of his deposition and cross-examination.  (Dkt. No. 11 at 4–5.)  On July 17, 2025, Phillips filed a motion to compel the completion of Moos's deposition in the Petryliene Lawsuit. (*Id.* at 5.)  In October 2025—nearly a year after Petryliene first moved to add them as necessary parties—Pillar, TCI, Villager FWB, and Farnham PATX were added as defendants in the Petryliene Lawsuit.  (Int. Resp. at 11.)  After expressing their belief that Johansen was disqualified from a case in which they were not parties, Pillar and TCI did not move to disqualify Johansen in any of the ongoing lawsuits in which they were directly adverse to him.  And despite Swain's assurance of swift action in his letters to Johansen, neither did Pillar and TCI file a motion to disqualify once they were parties to the Petryliene Lawsuit.  (*Id.*)

## C.    The NDA

The parties involved in the Pillar Lawsuit, the HGH Lawsuit, and the ABC Land Lawsuit agreed to submit all three disputes to mediation.  (Dkt. No. 12 ("Am. Compl.") at 5.)  Under the resulting mediation settlement agreement, each case was resolved with its own settlement agreement.  (Resp. to TCI at 3.)  Pursuant to the terms of the ABC Land settlement agreement, the parties executed a Confidentiality, Non-Disclosure, and Non-Disparagement Agreement (the "NDA") on November 3, 2025.  (TCI Br. at 9.)

The NDA covers "Moos Related Parties" for the benefit of the "Phillips Related Parties." (TCI App. 188.) The NDA defines "Moos Related Parties" to include Moos, Deborah Moos, five specific entities under Moos's control, and "any officers, directors, members, managers, parents, subsidiaries, owners, shareholders, principals, agents, direct or indirect affiliates, heirs, successors, and/or assigns." (*Id.* 215.) Phillips, Pillar, and TCI are expressly included by name under the NDA's definition of the "Phillips Related Parties." (*See id.* 216–17.) Villager FWB and Farnham PATX are covered as Phillips Related Parties because they are wholly owned by LBLIC, which in turn is a subsidiary or affiliate of the expressly named Liberty Life Trust Group. (Lib. Br. at 8.) The "Protected Information" under the NDA covers any and all information, records, and documents acquired by Moos during the period of his employment or in the course of the Pillar, HGH, or ABC Land Lawsuits concerning any Phillips Related Party; this includes the Phillips Related Parties' transactions, corporate governance, and attorney-client privileged communications. (TCI App. 192–94.) Under the terms of the NDA, the Moos Related Parties are obligated to keep the Protected Information confidential unless disclosure is explicitly required by law or consented to, in writing, by the Phillips Related Parties. (*Id.* 198–200.) The Moos Related Parties are responsible for ensuring their "Representatives" comply with the NDA. (*Id.* 198.) The NDA also requires Moos Related Parties to return or destroy all Protected Information upon written demand of Pillar. (*Id.* 200–01.)

### D.     Post-NDA Conduct and the Present Case

Following the signing of the NDA in November, counsel in the Petryliene Lawsuit exchanged several emails from December 2025 to February 2026 attempting to schedule a day when all parties would be available to complete Moos's deposition. (*See* Am. Compl. Ex. 2-G, 2-H, 2-I.)  On February 2, Johansen filed a change of address with the court, providing notice that he departed his previous firm, Egan Nelson, and joined the Dallas office of Blank Rome.  (Lib. App. 7.)  About one week later, counsel for the Phillips Related Parties confirmed availability to complete Moos's deposition on March 5, 2026.  (*See* Am. Compl. Ex. 2-I.)  On February 13, 2026, the Petryliene Parties filed and served notice that Moos's deposition would be continued on March 5, 2026.  (*See id.* Ex. 2-J.)

On February 24, Madden, as counsel for the Phillips Related Parties, contacted Johansen to assert that Moos's continued participation in the deposition would be completely voluntary and not required under law because the subpoena that summoned Moos to his original September 2024 deposition was invalid.  (*Id.* at 14, Ex. 2, at 6.)  Therefore, the Phillips Related Parties would treat Moos's attendance at the continued deposition as a violation of the NDA and, if necessary, seek a TRO in federal court to prevent Moos from completing his deposition.  (*Id.* Ex. 2, at 6.)  On February 27, the Petryliene Parties filed an emergency motion to compel the completion of Moos's deposition.  (*See id.* Ex. 2.)  On March 4—the day before the scheduled completion of Moos's deposition—Pillar, TCI, and Phillips

-14-

initiated the present case by filing suit against Moos in federal court. (*See* Dkt. No. 1.) This initial complaint brought claims for breach of the NDA and anticipatory breach/repudiation of the NDA, seeking a TRO and a preliminary injunction to halt the deposition and compel the return of all Protected Information under the NDA still in Moos's possession. (Am. Compl. at 18–25.)

On March 13, 2026, Phillips learned that Johansen had moved to Blank Rome—a firm that LBLIC had retained in April 2025 to represent it in two financing transactions. (Lib. Br. at 4, 9.) Johansen quickly received letters from Madden arguing that his affiliation with Blank Rome created conflicts of interest for Johansen in the Petryliene Lawsuit as well as this present case. (*See* Lib. App. 62–66.) On March 16, Mark Harris—the Partner at Blank Rome who represented LBLIC in the two transactions—sent an email to Phillips seeking a conflict waiver to allow Johansen to continue representing his clients in a matter "unrelated" to Blank Rome's prior representation of LBLIC. (Lib. Br. at 9.) Phillips promptly declined to grant the waiver. (*Id.*) On March 18, Blank Rome's General Counsel Larry Shtasel emailed Madden to share his firm's position that, if any conflict existed, LBLIC had waived it under the advance general waiver included in the engagement letter it signed with Blank Rome in April 2025. (*Id.* at 9–10.) On March 27, Phillips, Pillar, and TCI filed an amended complaint to add Villager FWB and Farnham PATX— two SABREs wholly owned and operated by LBLIC—as plaintiffs in this case. (*See* Am. Compl.) And on March 31, Madden responded at length to Shtasel's March 18

-15-

letter, rejecting Blank Rome's advance waiver theory and detailing, in his view, the conflicts at issue in this case. (Lib. Br. at 10.)

The Petryliene Parties sought to intervene in this case, and on April 9, this Court granted the Petryliene Parties' motion to intervene and denied the Plaintiffs' motion for a TRO. (Dkt. No. 17 at 1.) On May 1, Pillar and TCI filed a motion to disqualify Johansen and Blank Rome from this case. (*See* TCI Mot.) This motion focuses on two primary arguments: (1) that, under the *Meador/RSR* factors, Johansen should be disqualified for knowingly receiving, actively reviewing, and unilaterally divulging Pillar's and TCI's attorney-client privileged communications before and during Moos's deposition, and (2) that Johansen's disqualification is required because he is a necessary fact witness in this case. (TCI Br. at 1–3.) The Liberty Parties filed a separate motion to disqualify on May 2, arguing primarily that Blank Rome's concurrent representations of, on the one hand, LBLIC across multiple financing transactions, and, on the other, Moos and the Petryliene Parties in this case, create a conflict of interest that can only be remedied by disqualification. (Lib. Br. at 1–2.) The Liberty Parties also contend that Johansen is a Moos Related Party under the NDA who, in facilitating the production of Protected Information during Moos's deposition, himself violated the NDA, independently warranting his disqualification from this case. (*Id.* at 20–21.)

The Petryliene Parties, following this Court's denial of a TRO to halt Moos's deposition, served notice to the Defendants in the Petryliene Lawsuit on May 7,

-16-

2026, of their intention to resume the deposition on June 17.  (*See* Int. App. 323–24.)

TCI, Pillar, Phillips, Villager FWB, and Farnham PATX responded on May 12,

filing with the state court a motion to quash Petryliene's notice of continued

deposition.  (Int. Resp. at 12.)  That motion points directly to this case, arguing that

Moos's deposition cannot proceed until all motions still pending with the federal

court have been resolved.  (*Id.*)  Because a timely motion to quash under Texas rules

automatically stays a deposition until the motion can be determined, Tex. R. Civ. P.

199.4, the Petryliene Lawsuit is frozen in place for the time being.

## II.  LEGAL STANDARDS

The Fifth Circuit is "sensitive to preventing conflicts of interest."  *In re

ProEducation Int'l, Inc.*, 587 F.3d 296, 299 (5th Cir. 2009) (quoting *In re Am. Airlines,

Inc.*, 972 F.2d 605, 611 (5th Cir. 1992)).  District courts in this circuit are therefore

obligated to "take measures against unethical conduct occurring in connection with

any proceeding before" them.  *In re Am. Airlines*, 972 F.2d at 611 (citations omitted).

Motions to disqualify counsel are the proper vehicles for concerned party-litigants to

bring potential conflicts of interest or breaches of ethical duties to the attention of the

court.  *Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (5th Cir. 1980) (citation

omitted).  It is the court's responsibility to carefully assess each motion to disqualify,

because, to a large extent, if a conflict or ethical breach is not addressed by the court,

"it may not be addressed at all."  *In re Am. Airlines*, 972 F.2d at 611.

"Motions to disqualify are substantive" in nature and are thus "decided under federal law." *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995). Disqualification cases are guided by "state and national ethical standards adopted by" the Fifth Circuit. *In re Am. Airlines*, 972 F.2d at 610. The Model Rules of Professional Conduct ("Model Rules") established by the American Bar Association ("ABA") have been recognized as "the national standards utilized by this circuit in ruling on disqualification motions." *Id.* Additionally, this Court must consider the Texas Disciplinary Rules of Professional Conduct ("Texas Rules"), as well as the "opinions from Texas courts and the State Bar of Texas interpreting those rules," *In re Meador*, 968 S.W.2d at 350, because they provide the disciplinary standards that "govern attorneys practicing in Texas generally." *U.S. Fire Ins. Co.*, 50 F.3d at 1312. "The local rules promulgated by the local court itself" are also relevant to the disqualification inquiry, *id.*, though they cannot serve as the "sole" basis for denying a party the counsel of their choice, *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992). The Northern District of Texas has incorporated the Texas Rules into its local rules. *See* N.D. Tex. L. Civ. R. 83.8(e). Therefore, when deciding a motion to disqualify, this Court "consider[s] both the Texas Rules and the Model Rules." *In re ProEducation*, 587 F.3d at 299.

Disqualification is an extreme sanction, one "that must not be imposed without careful consideration." *U.S. Fire Ins. Co.*, 50 F.3d at 1313. Motions to disqualify are susceptible to abuse as "procedural weapons," used not to protect the

interests of the parties to a case but "to advance purely tactical purposes." *In re Am. Airlines*, 972 F.2d at 611. And when a disqualification inquiry is "instigated by an opponent," the risk is "palpable" that a party may be unfairly denied his choice of counsel. *U.S. Fire Ins. Co.*, 50 F.3d at 1316. Because disqualification is such a severe penalty, its rules and guidelines are not applied "mechanically." *In re ProEducation*, 587 F.3d at 300 (quoting *U.S. Fire Ins. Co.*, 50 F.3d at 1314). Rather, courts must consider "[a]ll of the facts particular to a case" according to "the relevant ethical criteria," paying "meticulous deference to the litigant's rights." *U.S. Fire Ins. Co.*, 50 F.3d at 1314. Courts will not impose disqualification absent a "reasonable possibility that some specifically identifiable impropriety did in fact occur." *Woods v. Covington Cty. Bank*, 537 F.2d 804, 813 (5th Cir. 1976). On a motion to disqualify, "the ultimate burden of proof"—to show both that some unethical conduct occurred and that disqualification is the proper remedy—falls upon the movant. *Galderma Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 398 (N.D. Tex. 2013).

### III. ANALYSIS

#### A.    Disqualification Under *Meador* and *RSR*

Plaintiffs assert that Johansen should be disqualified from representing Moos and the Petryliene Parties in this case pursuant to the six-factor framework for disqualification set forth in *Meador*. (*See* TCI Br. at 12–20.) Courts sometimes apply the *Meador* factors in cases where the moving party seeks to disqualify opposing counsel for obtaining an opponent's privileged materials outside the normal course of

discovery. *See, e.g.*, *Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc.* (*NRA*), No. 3:19-CV-2074-G, 2020 WL 5526553, at \*3 (N.D. Tex. Sept. 14, 2020). The *Meador* factors are: (1) whether the attorney "knew or should have known" that he received privileged material; (2) how swiftly the attorney notified the opposing side that he received its privileged information; (3) the extent and depth of the attorney's review of the privileged materials; (4) whether the privileged information is so significant that "its disclosure may prejudice the movant's claim or defense, and the extent to which return of the documents will mitigate that prejudice;" (5) the extent to which the moving party may be responsible for the unauthorized disclosure; and (6) "the extent to which the nonmovant will suffer prejudice from the disqualification of his attorney." *In re Meador*, 968 S.W.2d at 351–52.

Plaintiffs contend that Johansen's conduct in managing the document productions before and during Moos's deposition, considered in the light of these factors, merits his disqualification from this case. (*See* TCI Br. at 14–19.) Moos and the Petryliene Parties dispute this, arguing not only that the *Meador* factors actually counsel against Johansen's disqualification, but that Plaintiffs have waived any *Meador*-based objection they may have had to Johansen's continued participation in this case by failing to timely move for his disqualification on those grounds. (Resp. to TCI at 13–16; Int. Resp. at 21–23.)

### 1. Pillar and TCI have waived their objections under *Meador*.

A litigant "who is entitled to object to an attorney representing an opposing party . . . but who knowingly refrains from" promptly doing so "is deemed to have waived that right." *Cinco Bayous, LLC v. Samson Expl., LLC*, No. 1:19-CV-452, 2020 WL 13533320, at *7 (E.D. Tex. Aug. 17, 2020) (quoting *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, No. H-09-3712, 2010 WL 11661414, at *5 (S.D. Tex. July 30, 2010)). "Waiver of a motion for disqualification of counsel is proper where the delay in moving for a disqualification is for an extended period of time, or where it is done on the eve of trial." *Stonecoat of Tex., LLC v. Procal Stone Design, LLC*, No. 4:17-CV-00303, 2019 WL 9899506, at *12 (E.D. Tex. Mar. 8, 2019) (citing *Abney v. Wal-Mart*, 984 F. Supp. 526, 530 (E.D. Tex. 1997)). "A motion to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion." *Cinco Bayous*, 2020 WL 13533320, at *7 (quoting *Cox v. Am. Cast Iron Pipe Co.*, 847 F.2d 725, 729 (11th Cir. 1988)). When a party waits a year or more to file a motion to disqualify, federal courts often find that he is engaged in precisely the kind of dilatory tactic, designed to prejudice his opponent, that constitutes waiver. *See id.* (collecting cases).

These federal cases are consistent with the decisions of Texas courts, which define waiver as "the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *In re RSR Corp.*, 568 S.W.3d 663, 666 (Tex. 2019) (quoting *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d

773, 778 (Tex. 2008)).  In determining whether a party has waived a complaint, courts consider the length of time between when the grounds for disqualification become apparent to the aggrieved party and when that party moves to disqualify.  *See Vaughan v. Walther*, 875 S.W.2d 690, 690–91 (Tex. 1994) (finding waiver when movant files for disqualification six and a half months after discovering conflict of interest).  But time alone is not dispositive; Texas courts weigh a number of additional factors, such as whether anything in the record indicates the motion was filed "not due to a concern that attorney-client confidences may be divulged, but as a dilatory trial tactic," *In re Kahn*, 533 S.W.3d 387, 391–92 (Tex. App.—Houston [14th Dist.] 2015, orig. proceeding) (citations omitted), whether the moving party has "a reasonable explanation for the delay, whether significant discovery has occurred, and whether the delay prejudiced the respondents," *In re Kyle Fin. Grp., LLC*, 562 S.W.3d 795, 799 (Tex. App.—Houston [14th Dist.] 2018, orig. proceeding) (citing *In re EPIC Holdings, Inc.*, 985 S.W.2d 41, 52–53 (Tex. 1998)).

Plaintiffs assert that the authorities on waiver cited by Moos and the Petryliene Parties are inapplicable to this situation, because they each dealt only with waiver within a single case to which the movant was a party.  (TCI Reply at 8.) Pillar and TCI did not become parties to the Petryliene Lawsuit until October 2025, and Moos is still not a party to that case.  (*Id.*)  In their view, there was no dispute in which Pillar and TCI could have sought Johansen's disqualification "as adverse counsel in a proceeding to which they were parties" until Moos retained Johansen to

represent him in this case in March 2026. (*Id.*) But Pillar and TCI admit that, on October 23, 2024—when they first expressed their belief that Johansen was disqualified under *Meador* for his handling of their privileged material in and around the Moos deposition—Johansen was representing Moos in three active lawsuits "in direct adversity to Pillar, TCI, Bradford Phillips, and the Phillips Related Parties." (TCI Br. at 5.) In at least two of these lawsuits—the Pillar Lawsuit and the ABC Land Lawsuit—Moos was a party directly adverse to either Pillar or TCI.

Every element of the *Meador* argument for disqualification that Pillar and TCI advance in this case would have been equally applicable in both the Pillar and ABC Land Lawsuits; the deposition had already occurred, and Johansen was adverse to them. Yet Pillar and TCI did not move for Johansen's disqualification in those cases, choosing instead to demand his removal from the Petryliene Lawsuit—a case with which they were not yet involved—with a threat to "immediately file a motion to disqualify" if they were ever added as parties. (Def. App. 19.) TCI continued with the ABC Land Lawsuit, bringing new claims for conversion and theft of Pillar documents on November 4, 2024, (*see* Dkt. No. 11-7 at ECF 48), and later filing an unsuccessful motion to compel the complete production of Moos's bins of files on April 29, 2025, (*see* Dkt. No. 11-12), but otherwise raising no objections to Johansen's continued participation in that case. And when Pillar and TCI became parties to the Petryliene Lawsuit in October 2025, nearly a year after asserting that Johansen had improperly obtained privileged communications that "relate directly to

-23-

the claims" at issue in that case, (Def. App. 19), they still did not move to disqualify Johansen.

Pillar and TCI instead, alongside the other Phillips Related Parties, continued the negotiations with Johansen that ultimately resulted in three settlement agreements and an accompanying NDA in November 2025, resolving the Moos Related litigation. (TCI Br. at 9.) They then moved forward in the Petryliene Lawsuit as well, communicating with Johansen over the course of three months in late 2025 and early 2026 to schedule the completion of Moos's deposition. (*See* Am. Compl. Ex. 2-G, 2-H, 2-I.) On February 24, 2026, Plaintiffs abruptly announced their opposition to Moos's continued deposition, and they did so on grounds— service of an invalid subpoena—wholly unrelated to Johansen's handling of their privileged material. (*Id.* at 14, Ex. 2, at 6.) Pillar, TCI, and Phillips filed this lawsuit in March, seeking a TRO to prevent Moos from completing his deposition. (*See* Dkt. No. 1.) It was only after the TRO was denied that Pillar and TCI moved to disqualify Johansen from this case, in part, under the *Meador* factors.

Pillar and TCI moved to disqualify Johansen 18 months after first "discover[ing] the facts which lead to the[ir] motion." *See Cinco Bayous*, 2020 WL 13533320, at *7 (quoting *Cox*, 847 F.2d at 729). They offer little in the way of explanation for this delay, simply stating that they were incapable of moving to disqualify Johansen until this case was filed in March 2026, despite the fact that one or both of Pillar and TCI faced Johansen-represented parties in at least one lawsuit at

all times between October 2024 and March 2026.  (TCI Reply at 8.)  The sheer length of this delay seems inconsistent with a sincere concern on the part of Pillar and TCI that their privileged communications were improperly divulged to an adverse attorney.  They flagged the potential ethical issue but held onto it and did nothing for more than a year.  These disqualification motions may not have been filed "on the eve of trial," *Stonecoat of Tex., LLC*, 2019 WL 9899506, at \*12, but they were filed in this case immediately after Plaintiffs' request for a TRO was denied, which itself was filed the night before Moos's deposition was scheduled to continue.  Under the totality of circumstances, the facts underlying the motions point more strongly in the direction of dilatory tactics than they do toward a genuine effort to preserve client privileges and ethical duties.  The Court finds Pillar and TCI's disqualification motion, to the extent it is based on *Meador*, primarily strategic rather than substantive.  Their *Meador* objections are waived.

### 2. Johansen is not disqualified under the *Meador* factors.

Because Pillar and TCI have waived their arguments for disqualification under *Meador*, the Court need not apply its six-factor framework.  But even supposing that Pillar and TCI had not waived this argument, the Court concludes that Johansen's conduct does not justify disqualification on these grounds.  To this end, the Court finds the fourth and sixth *Meador* factors instructive.  Under the fourth factor, courts consider "the significance of the privileged information; *i.e.*, the extent to which its disclosure may prejudice the movant's claim or defense, and the extent to which

-25-

return of the documents will mitigate that prejudice." *In re Meador*, 968 S.W.2d at 352. Under the sixth, courts assess "the extent to which the nonmovant will suffer prejudice from the disqualification of his or her attorney." *Id.*

Pillar and TCI call the fourth factor "the most important factor here," stating matter-of-factly that "[t]his is that situation" where the privileged information at issue "is so sensitive that disqualification is necessary to ensure a fair trial." (TCI Br. at 17 (quoting *In re Meador*, 968 S.W.2d at 351)). Moos responds that Pillar and TCI, from Swaim's 2024 letters raising *Meador* concerns for the first time through to the present motions, have not once described the privileged information Johansen allegedly reviewed or its relevance to this case in any detail. (Resp. to TCI at 19.) Indeed, despite their odes to the sanctity of attorney-client privilege and its "unique and venerated position in the legal system," Pillar and TCI point to no specific information in Moos's documents that is likely to significantly prejudice their claims or defenses in this case. (TCI Br. at 17.) This leaves the Court unable to "determine the extent of any harm to" Pillar and TCI. *In re Meador*, 968 S.W.2d at 352.

Under the sixth factor, Pillar and TCI frame whatever prejudice Moos and the Petryliene Parties might face from Johansen's disqualification as nothing more than the minor inconvenience of retaining new counsel and adjusting briefing schedules. (TCI Br. at 19.) But Moos argues persuasively that the prejudice he would suffer from Johansen's disqualification would be "severe." (Resp. to TCI at 20.) Johansen has represented Moos in multiple lawsuits against Pillar, TCI, and other Phillips

Related Parties over the last five years.  Consequently, he possesses a "deep familiarity with the factual and legal history" between Moos and the Plaintiffs in this case.  (*Id.*)  Johansen and Moos undoubtedly have a strong attorney-client relationship, with trust and confidence "built over years of representation."  (*Id.*)  To disqualify Johansen from this case now would deprive both Moos and the Petryliene Parties of retained counsel with a firm grasp of the complicated record at issue in both this case and the Petryliene Lawsuit.  The Court is convinced that, under these circumstances, "disqualification would confer an enormous strategic advantage upon" the Plaintiffs in this case.  *In re Meador*, 968 S.W.2d at 352–53 (cleaned up).

In *Meador*, the Supreme Court of Texas concluded that the trial court did not abuse its discretion in denying a motion to disqualify because the fourth and sixth factors weighed in favor of the nonmoving party, even though the other factors weighed in favor of disqualification.  *See id.* at 351–53.  Here, the other factors are not so definitive in favor of disqualification.  Key *Meador* factors, such as the third—the extent of the attorney's review of the privileged information—and the fifth—the "extent to which movant may be at fault for the" inadvertent disclosure—are the subjects of unresolved, fiercely contested factual disputes between the parties.  *Id.* at 352.  Plaintiffs bear the burden of proof, and despite their dramatic declarations to the contrary, Pillar and TCI have failed to carry this burden under the *Meador* framework.  "[A] court should not disqualify a lawyer for a disciplinary violation that has not resulted in actual prejudice to the party seeking disqualification."  *Id.* at

-27-

350 (citation omitted). Pillar and TCI fall short of establishing a disciplinary violation, let alone actual prejudice; their *Meador* argument for disqualification fails. *See Orchestratehr, Inc. v. Trombetta*, No. 3:13-CV-2110-KS-BH, 2016 WL 4563348, at *14 (N.D. Tex. Sept. 1, 2016).

### 3. Plaintiffs' additional *Meador* arguments fail.

In addition to arguing straightforwardly for Johansen's disqualification under the *Meador* factors, Pillar and TCI advance two tangentially related theories. The first is that Johansen's handling of the privileged materials goes beyond the conduct normally assessed under the *Meador* factors, falling within that case's "reserved, more culpable category." (TCI Br. at 20.) The *Meador* factors only apply when, as is alleged in this case, "a lawyer receives an opponent's privileged materials outside the normal course of discovery," such as from a client who obtained the materials through illicit means. *In re Meador*, 968 S.W.2d at 352. The Supreme Court of Texas "express[ed] no opinion" in *Meador* "on the proper standard for disqualifying an attorney who was directly involved in wrongfully procuring an opponent's documents." *Id.* Pillar and TCI accuse Johansen of "systematic, active engagement" of their privileged materials. (TCI Br. at 21.)

Set aside the fact that—even if Pillar and TCI were to definitively establish Johansen's direct involvement in the wrongful procurement of their materials—the *Meador* Court explicitly declined to articulate a standard for disqualifying attorneys under such circumstances. Pillar and TCI do not even argue that Johansen was

-28-

"directly involved" in the original, allegedly wrongful procurement of their materials by Moos. They instead point to Johansen's facilitation of document productions before and during Moos's September 2024 deposition, draw a connection to Johansen's representation of the Petryliene Parties beginning in October 2024, and call it active procurement. (*See id.*) Pillar and TCI make the "compelling inference" that Johansen was likely already in "active retention discussions" with the Petryliene Parties as he was reviewing privileged materials and deciding what to share with them via document productions. (*Id.* at 16–17.) Crucially, Pillar and TCI offer absolutely nothing to support these allegations or to controvert Johansen's statements that he merely produced documents, on behalf of his client, in response to a then-unchallenged subpoena served by an unaffiliated third party. (*See id.* at 16–17, 20–21; Resp. to TCI at 20-21.) This kind of baseless conjecture falls far short of the bar to prove that disqualification is necessary.

The second *Meador*-adjacent argument concerns what Pillar and TCI refer to as Johansen's "Dual-Obligation Conflict." (TCI Br. at 21.) Pillar and TCI contend that, as Johansen allegedly reviewed their privileged material prior to the Moos deposition in August and September of 2024, he "labored under [two] irreconcilable obligations[:]" one, the duty of loyalty and zealous advocacy owed to his client, Moos, the other, his "independent obligation" as an attorney to turn over the privileged materials to Pillar and TCI and "seek court guidance." (*Id.*) Pillar and TCI cite to *Meador*—and, confusingly, to Model Rule 1.18, which concerns duties to

prospective clients, Model Rules of Prof'l Conduct R. 1.18 (2023)—as support for their position that Johansen should be disqualified because he "consistently chose Moos's interest . . . over the privilege obligation." (TCI Br. at 21.) But *Meador* establishes no brightline rule by which attorneys must immediately turn over potentially privileged materials or face disqualification; it sets a standard, a group of six factors to consider when evaluating attorney behavior in a given case. *See In re Meador*, 968 S.W.2d at 351. And the Court has already concluded that Pillar and TCI failed to carry their burden to prove disqualification is necessary under those factors. This "Dual-Obligation Conflict" argument for disqualification fails.

## B.   Necessary Witness

Plaintiffs next argue that Johansen must be disqualified because he is a necessary fact witness on material issues at the core of this case. (*See* TCI Br. at 22–23; Lib. Br. at 21–22.) It is "a long-standing ethical rule" that attorneys should not serve "as both an advocate and a witness in the same litigation." *U.S. Fire Ins. Co.*, 50 F.3d at 1311. Under Model Rule 3.7(a), a lawyer "shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness," unless disqualification "would work substantial hardship on the client" or unless the lawyer's testimony is limited to "uncontested issue[s]" and "the nature and value of legal services rendered in the case." Model Rules of Prof'l Conduct R. 3.7(a) (2023). Texas Rule 3.08(a) provides a nearly identical prohibition, barring attorneys from serving as "an advocate before a tribunal" when they know or believe that they "may be a witness

-30-

necessary to establish an essential fact on behalf of" their client.  Tex. Rules of Prof'l Conduct R. 3.08(a) (2024).  Under both rules, "disqualification is only appropriate if the lawyer's testimony is necessary to establish an essential fact." *In re Sanders*, 153 S.W.3d 54, 57 (Tex. 2004) (cleaned up).  "A lawyer is not likely to be a necessary witness when evidence pertaining to each matter to which he could testify is available from another source." *United States v. Starnes*, 157 F. App'x 687, 693–94 (5th Cir. 2005) (cleaned up).

Plaintiffs contend that there are four issues in this case on which Johansen is a necessary witness: (1) the "validity" of the subpoena duces tecum served on Moos prior to his deposition and "Johansen's decision to accept it," (2) the "content and scope of Pillar's and TCI's privileged communications" in Moos's bins of files, (3) "[w]hether and when Pillar or TCI were notified of the privilege issues" identified during Moos's document productions, and (4) "[w]hen Johansen first discussed representing the Petryliene" Parties.  (TCI Br. at 22.)  Plaintiffs argue that each of these issues turns on facts within "Johansen's unique personal knowledge," facts that "are in his head alone." (*Id.* at 22–23.)  But it is difficult to see how this could be true.

Moos, the process server who served the subpoena duces tecum on him, and Petryliene's counsel of record Mary Nikezic can testify to whether the subpoena was issued and served in compliance with Texas procedure.  Johansen has stated on the record that he "never personally reviewed any of the unredacted documents" Moos

collected for the deposition. (Def. App. 2.) The redaction process was carried out by personnel at his old firm, Egan Nelson, and he did not analyze the substance of any redacted communication. (*Id.*) Johansen thus would be incapable of testifying to the "content and scope of Pillar's and TCI's privileged communications" in Moos's possession. (TCI Br. at 22.) As he still possesses these files, Moos can testify to their contents. And firm personnel at Egan Nelson can corroborate or contradict Johansen's account of the redaction process. Employees, officers, representatives, agents, and legal counsel of Pillar and TCI can attest to whether the two entities were ever notified of potential privilege issues with Moos's document productions. The Petryliene Parties can explain when they first spoke with Johansen about retaining him as local counsel.

Almost every item of information that Johansen could provide as a witness is already available from another source. The one exception in the issues identified by Plaintiffs that could accurately be said to be "in his head alone" is the reasoning behind Johansen's choice to "accept" the subpoena duces tecum. But Plaintiffs have failed to articulate how Johansen's testimony regarding his acceptance of the subpoena would prejudice them. Texas courts have made it clear that "the party requesting disqualification" under the advocate-witness rule "must demonstrate that the opposing lawyer's dual roles as attorney and witness will cause the party actual prejudice." *In re Sanders*, 153 S.W.3d at 57 (citing *Ayres v. Canales*, 790 S.W.2d 554, 558 (Tex. 1990)). Similarly, the Fifth Circuit has advised that, where an attorney's

"participation as both a lawyer and witness stands to prejudice only his own client, the opposing attorney should have no say in the matter." *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 267 (5th Cir. 2001) (citing *U.S. Fire Ins. Co.*, 50 F.3d at 1315). The party moving for disqualification bears the "burden of establishing prejudice with specificity." *Id.* (citation omitted). Here, Plaintiffs do not even suggest they would be prejudiced by Johansen taking the stand to explain why he accepted the subpoena duces tecum. Because they do not explain why Johansen's testimony on this issue is harmful or necessary to their claims, Plaintiffs fail to demonstrate that Johansen is a necessary witness in this case.

## C.   Concurrent Conflict of Interest

"As a general rule, a lawyer is not allowed to sue his own client, which he concurrently represents in other matters." *Galderma*, 927 F. Supp. 2d at 395 (citing *In re Dresser*, 972 F.2d at 540). This principle is embodied in Model Rule 1.7, which prohibits lawyers from taking up representations that will involve a concurrent conflict of interest. Model Rules of Prof'l Conduct R. 1.7(a) (2023). Model Rule 1.7 defines a concurrent conflict of interest as any situation where the "representation of one client [is] directly adverse to another" or at significant risk of being "materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." *Id.* The one exception to this rule is provided by Model Rule 1.7(b). A lawyer may represent a client in spite of a concurrent conflict if: (1) he "reasonably believes" his competent representation of

each client will be unaffected, (2) the "representation is not prohibited by law," (3) he is not asserting a claim by one client against another client he represents within the same proceeding, and (4) "each affected client gives informed consent, confirmed in writing." *Id.* R. 1.7(b).

The corresponding Texas Rule—Texas Rule 1.06—is more lenient than Model Rule 1.7, allowing a lawyer to represent one client against another current client so long as the two matters are not substantially related and the representation does not "reasonably appear[ ] to be or [to] become adversely limited by the lawyer's or the law firm's responsibilities to another client" or by the lawyer's or the law firm's own interests. Tex. Rules of Prof'l Conduct R. 1.06(b) (2024). If the two matters are not substantially related, there is no need, under the Texas Rule, to obtain the informed, written consent of the affected clients. *See id.*

The Fifth Circuit has explained that when the state and national ethical standards relevant to deciding a particular disqualification inquiry offer divergent, even contradictory rules, a court "must weigh the relative merits of each of the various competing disqualification rules as [it] proceed[s] through each successive step of [its] analysis." *U.S. Fire Ins. Co.*, 50 F.3d at 1312. And courts in this circuit have determined that, when the difference between the Model Rule and the Texas Rule—here, whether informed, written consent is required before a lawyer can represent one client against another—goes to the central issue of a disqualification claim, the more restrictive standard controls. *See Galderma*, 927 F. Supp. 2d at 396.

-34-

To favor the less stringent Texas rule over the Model Rule in this case would frustrate the very purpose of the national standard, to ensure that concurrent conflicts only occur with the complete knowledge and approval of the concerned clients. *See id.*

The concurrent conflict arguments for disqualifying Johansen and Blank Rome from this case will thus be resolved according to the Model Rules and related authorities. Under Model Rule 1.7, a client's waiver of future conflicts is only valid if the client gives informed consent. Model Rules of Prof'l Conduct R. 1.7(b)(4) (2023). And under Model Rule 1.10, any Model Rule 1.7 conflict that prevents one lawyer from representing a particular client is imputed to all other lawyers at his firm. *Id.* R. 1.10(a). The Texas equivalent of this rule, Texas Rule 1.10, similarly imputes an attorney's Texas Rule 1.06 conflicts to the rest of his law firm. Tex. Rules of Prof'l Conduct R. 1.10(a) (2024).

### 1. Pillar and TCI fail to establish that a concurrent conflict exists.

In their motion to disqualify, Pillar and TCI argue that Johansen's "simultaneous representation of Moos . . . and Petryliene . . . constitutes an independent concurrent-conflict violation under [Model] Rule 1.7." (TCI Br. at 23.) When Moos refuted this in his response, TCI and Pillar replied that Moos had "misidentifie[d]" the Model Rule 1.7 conflict. (TCI Reply at 10.) The true Model Rule 1.7 problem in this case, they explain, is that Johansen is representing both Moos and the Petryliene Parties in direct adversity to two "former clients of

Johansen's firm"—Pillar and TCI. (*Id.*)  A few paragraphs later, Pillar and TCI

contend that Johansen is further conflicted under Model Rule 1.7(a)(2) because his

representations of both Moos and the Petryliene Parties are materially limited by his

own personal interest in continuing to represent them in this action.  (*Id.* at 11.)

These are not serious arguments.  Moos is correct to point out that there is no

concurrent conflict present in Johansen's simultaneous representation of Moos and

the Petryliene Parties, because they are not directly adverse to one another.  (Resp. to

TCI at 22–23.)  Moos and the Petryliene Parties seek the same ultimate outcome in

this case: for Plaintiffs' claims to be dismissed, allowing Moos to complete his

deposition in the Petryliene Lawsuit.  There is nothing in the record or in Pillar and

TCI's motion indicating a "significant risk" that Johansen's representation of Moos

or the Petryliene Parties will be materially limited by his obligations to the other.

Similarly, there is no concurrent conflict between Johansen's personal interests and

his representations of Moos and the Petryliene Parties.  Pillar and TCI contend that

Johansen's representations of Moos and the Petryliene Parties are materially limited,

because every argument against disqualification that Johansen makes on their behalf

also advances his own personal interest in continuing to represent them.  (TCI Reply

at 11.)  But it is difficult to understand where the conflict arises under this view;

Pillar and TCI themselves point out that the interests of Johansen and his clients "are

aligned."  (*Id.*)  Their theory, if accepted, would render conflicted any attorney who

argues against a motion to disqualify.

Finally, there is no concurrent conflict involving Pillar and TCI, because Pillar and TCI are not "former clients of Johansen's firm." (*Id.* at 10.)  In Texas, the "attorney-client relationship is contractual," built on a mutual understanding and agreement as to "the nature of the work to be undertaken."  *SMWNPF Holdings, Inc. v. Devore*, 165 F.3d 360, 364–65 (5th Cir. 1999) (citations omitted).  The relationship forms "when an attorney agrees to render professional services for a client."  *Id.* at 365 (citations omitted).  Pillar and TCI allege no agreement or contract with Johansen, or with his former firms, for the provision of legal services.  They instead assert that they are former clients of Egan Nelson by virtue of the "metadata-redaction review" of their privileged communications conducted by firm personnel before Moos's deposition in 2024, citing as authority a case that provides no support for this theory.  (*See* TCI Reply at 10 (citing *In re Dresser*, 972 F.2d at 545).)  Pillar and TCI have failed to establish any of the three Model Rule 1.7 concurrent conflicts of interest that they allege plague Johansen's representations in this case.

## 2.  The Liberty Parties gave informed consent to waive this conflict.

The Liberty Parties argue that Johansen's affiliation with Blank Rome since February of this year creates a concurrent conflict of interest with his continued representation of Moos and the Petryliene Parties in this case.  (Lib. Br. at 1–2.)  Villager FWB and Farnham PATX contend that, as wholly owned SPEs of LBLIC, they are current clients of Blank Rome.  (*Id.* at 11–12.)  And there is no question that Johansen's representation of Moos and the Petryliene Parties in this case is in direct

adversity to them.  Moos does not contest the Liberty Parties' framing that they are current clients of Blank Rome, but he argues that, by signing onto the advanced waiver language in the engagement letter, LBLIC consented to waive all future conflicts in matters "not substantially related" to its representation by Blank Rome. (Resp. to Lib. at 12–13.)  In Moos's view, this satisfies the requirements of the Model Rule 1.7(b) exception and eliminates any concurrent conflict concern in this case. (*Id.*)  But the Liberty Parties assert that this advance waiver argument fails, because the waiver language was not adequate to allow for truly informed consent on their part, and because, even if the waiver is effective, they did not waive this conflict, because this case is substantially related to Blank Rome's prior representation of LBLIC.  (Lib. Br. at 15–18.)

### a.  LBLIC gave informed consent to the waiver of future conflicts.

The Liberty Parties have met their initial burden of establishing that a conflict of interest exists; Blank Rome does not dispute that it currently represents both the Liberty Parties, through LBLIC, and Moos and the Petryliene Parties, which are on opposite sides of this litigation.  Because Blank Rome raises the issue of informed consent in its defense, the burden of proof on this point shifts to its side—Blank Rome has the burden to show that LBLIC gave informed consent to waive this conflict.  *See Galderma*, 927 F. Supp. 2d at 398.  "To meet its burden of showing informed consent, [Blank Rome] must show that it provided reasonably adequate information for [LBLIC] to understand the material risks of waiving future conflicts

of interest." *Id.* (citing Model Rules of Prof'l Conduct R. 1.0, cmt. 6 (2023)).  In evaluating whether this standard has been met, this Court applies a two-step test. First, the Court focuses on the "information disclosed," assessing whether it is "reasonably adequate for a client to form informed consent." *Id.* at 398–99.  If it is, the Court then considers the specific circumstances of the aggrieved party, determining whether the firm's "disclosure is reasonably adequate for the particular client involved in this case." *Id.* at 399.

### i.  Adequate Information for a Client to Form Informed Consent

Model Rule 1.0(e) identifies three factors that must be present in a disclosure for it to be a reasonably adequate basis for informed consent: (1) "agreement . . . to a proposed course of conduct," (2) after the lawyer or firm "has communicated adequate information and explanation about the material risks," and (3) the lawyer or firm has proposed "reasonably available alternatives to the proposed course of conduct."  Model Rules of Prof'l Conduct R. 1.0(e) (2023).  "The language of the agreement is a primary source for determining whether or not" the client gave informed consent.  *Galderma*, 927 F. Supp. 2d at 399 (citing *Celgene Corp. v. KV Pharm. Co.*, No. 07-4819 (SDW), 2008 WL 2937415, at *8 (D.N.J. July 29, 2008)).

The April 2025 engagement letter between Blank Rome and LBLIC states, in relevant part, that "you [LBLIC] agree that our representation of you in this or any future matter will not disqualify the firm from, now or in the future, representing other clients opposing you in litigation . . . that [is] not substantially related to the

subject matter of this representation." (Lib. App. 14.)  The letter further states that LBLIC "hereby consent[s] to any conflict of interest with respect to those representations." (*Id.*)  Additionally, the letter contains assurances on the part of Blank Rome that at "no time would we use or disclose any confidential or proprietary information relating to our representation of you in connection with our representation of another client without your written consent." (*Id.*)

This waiver language satisfies the first requirement under Model Rule 1.0(e), because it identifies a course of conduct for the parties.  Model Rules of Prof'l Conduct R. 1.0(e) (2023).  The parties agreed that Blank Rome would have wide latitude to represent other clients, including those who are directly adverse to LBLIC in litigation.  "The outer boundaries of the parties agreed course of conduct is defined" by limits on representing other clients in matters substantially related to Blank Rome's representation of LBLIC and on the use or disclosure of LBLIC's information in the representation of other clients.  *Galderma*, 927 F. Supp. 2d at 399.  Open-ended waivers, such as this one, are not per se unenforceable.  *See* Model Rules of Prof'l Conduct R. 1.7, cmt. 22 (2023).  And though this waiver language is general, it supports a finding of informed consent, because it provides a clear framework by which the parties can determine, when a conflict arises, whether Blank Rome will be disqualified.  *Galderma*, 927 F. Supp. 2d at 400.

The waiver language also satisfies the second requirement under Model Rule 1.0(e), because it "explains the material risk in waiving future conflicts." *Id.*  The

waiver language informs LBLIC that Blank Rome may represent other clients, "including clients who are direct competitors of you or may otherwise have opposing business interests to you," during the term of their representation. (Lib. App. 14.) The waiver language also makes clear that Blank Rome's representation of LBLIC will not disqualify the firm from representing clients in direct adversity to LBLIC in unrelated matters. (*Id.*) This language clearly states the material risks LBLIC faced in waiving future conflicts.

For the third factor, "the Court looks to see whether the waiver language contains any explanation of reasonably available alternatives to the proposed course of conduct." *Galderma*, 927 F. Supp. 2d at 400. In *Galderma*, this Court found that an engagement letter stating that the client need not retain the law firm if it did not consent to the proposed terms and conditions as included satisfied this third factor. *See id.* ("This language, although the least clear of the three factors, also supports a finding of informed consent."). It is enough for the engagement letter to raise a single alternative to simply accepting representation with all conditions and terms as presented. The Blank Rome engagement letter explains that its representation of LBLIC will be governed by the terms set forth in the letter "[a]bsent an express written agreement to the contrary." (Lib. App. 11.) In multiple paragraphs, the letter emphasizes that terms will be applied as they appeared, unless the parties otherwise agreed in writing. (*See id.* 11–12.) Under *Galderma*, this language makes the client, LBLIC, aware that altered, new terms could be negotiated and agreed

-41-

upon as an alternative to accepting the proposed engagement letter as presented. This language satisfies the third requirement under Model Rule 1.0(e).

The Liberty Parties contend that the waiver language in the April 2025 engagement letter cannot have provided adequate information for a client to form informed consent, because this precise language had already been rejected as ineffective in federal court. (*See* Lib. Br. at 15–16 (citing *GSI Com. Sols., Inc. v. BabyCenter, LLC*, 618 F.3d 204 (2nd Cir. 2010))). In *GSI*, the Second Circuit rejected Blank Rome's broad waiver language disclaiming the representation of any affiliate or subsidiary beyond the expressly named client and held that the firm's "prospective waivers of certain conflicts . . . were strictly limited to specifically delineated matters." (*Id.* (citing 618 F.3d at 212–14) (cleaned up)). According to the Liberty Parties, this conclusively forecloses any possibility of finding effective waiver language in the April 2025 engagement letter. (*Id.* at 16.)

But the Liberty Parties err on a few points. First, to the extent they focus on a waiver theory concerned with corporate-affiliate conflicts, they waste their time; Blank Rome does not challenge the assertion that Villager FWB and Farnham PATX are its clients through LBLIC, and it does not argue waiver on that front. Second, *GSI* is not the "controlling federal authority" they proclaim it to be, (Lib. Reply at 4)—as a Second Circuit decision, it is, at most, a persuasive authority for courts in the Fifth Circuit. Third, and most importantly, the waiver language

analyzed in *GSI* is not at all "materially identical" to that of the April 2025 engagement letter at issue in this case. (*Id.*)

In *GSI*, Blank Rome was disqualified from representing GSI Commerce Solutions, Inc. ("GSI") in litigation against BabyCenter, LLC ("BabyCenter"), a former client of Blank Rome and a wholly owned subsidiary of then-current client Johnson & Johnson, Inc. ("J&J"). 618 F.3d at 208–09. Blank Rome contended in that case that J&J, by signing its engagement letter, waived all future conflicts with its corporate affiliates or subsidiaries. *Id.* at 212. But the flaw in that argument, the Second Circuit explained, was that the actual waiver language in J&J's engagement letter at that time was cabined to a narrow subset of parties and subject matters. *Id.* at 213. "Specifically, the waiver is strictly limited to matters involving patent litigation and, even then, only to matters brought by either Kimberly-Clark or a generic drug manufacturer." *Id.* at 213. Because the engagement letter acknowledged Blank Rome's obligation to otherwise avoid conflicts arising out of its representation of J&J, and because the GSI litigation did not fall within one of the engagement letter's particular categories of waived conflicts, the Second Circuit held that J&J had not given informed consent to waive the concurrent conflict in that case. *Id.* at 213.

The waiver in the April 2025 engagement letter that is the subject of this litigation is fundamentally different from the provision at issue in *GSI*, because it contains no restrictions by party or subject matter. The language in this case is far

-43-

broader, waiving conflicts with all possible other clients, in any legal proceeding, regarding any subject, confined only by the promise to stay away from any matter "substantially related to this representation." (Lib. App. 14.)  The Liberty Parties' appeals to *GSI* are inapposite in this case.  The Court concludes that the waiver in the April 2025 engagement letter is reasonably adequate to allow clients in some circumstances to form informed consent.

### ii. Adequate Circumstances for LBLIC to Form Informed Consent

For the general, open-ended waiver to be valid in this case, Blank Rome must still establish that its disclosure was reasonably adequate to allow the Liberty Parties to understand the material risks involved in waiving future, not substantially related, conflicts.  *Galderma*, 927 F. Supp. 2d at 401.  The extent of communication necessary, or the depth of information that must be exchanged, to obtain true informed consent varies from client to client.  Model Rules of Prof'l Conduct R. 1.0, cmt. 6 (2023).  "The principal considerations at this point in the analysis are the sophistication of the parties and whether the client was represented by counsel independent of the law firm seeking the waiver."  *Galderma*, 927 F. Supp. 2d at 401 (citation omitted).

Sophisticated clients are "experienced in legal matters generally and in making decisions of the type involved."  Model Rules of Prof'l Conduct R. 1.0, cmt. 6 (2023).  Under the Model Rules, "a sophisticated client need not be provided as much information for the disclosure to be reasonably adequate for the client to give

informed consent." *Galderma*, 927 F. Supp. 2d at 402. LBLIC is a highly sophisticated client, "affiliated with over 15,000 financial professionals marketing and selling its products," with a life insurance base of over 250,000 policies. (Lib. App. 3.) In recent years, LBLIC has sought to diversify its investment portfolio by expanding into asset-backed financing. (*Id.*) LBLIC is also sophisticated in its legal experience. Seeking to invest in commercial real estate, LBLIC was comfortable quickly forming SABREs in Villager FWB and Farnham PATX specifically to purchase and hold two apartment complexes. (*Id.* 5.) On at least one prior occasion, LBLIC retained a large national law firm, Dechert LLP, as counsel for a loan transaction. (Dkt. No. 37-1 at 2.) And, through its CEO and Chairman of the Board, Phillips, as well as through its SABREs, Villager FWB and Farnham PATX, LBLIC has been involved in numerous lawsuits in state and federal court over the last six years. The record in this case demonstrates that LBLIC is a client who is highly sophisticated in legal matters generally, exhibiting a "level of sophistication [that] weighs in favor of finding informed consent in this case." *Galderma*, 927 F. Supp. 2d at 402.

The Liberty Parties argue that this case is not at all like the situation in *Galderma*, because there, the client's experienced general counsel was the one who signed the engagement letter and agreed to the waiver language. (Lib. Br. at 16 (citing 927 F. Supp. 2d at 392, 396).) Here, it was Phillips, as CEO of LBLIC, who signed the April 2025 engagement letter, acting without input from or discussion

with any counsel independent of Blank Rome. (*Id.*) It is true that whether or not a client was represented by independent counsel in accepting a waiver is an important factor for assessing informed consent—"a client who is independently represented by other counsel in giving the consent . . . should be assumed to have given informed consent." *Galderma*, 927 F. Supp. 2d at 397 (citation omitted). And though LBLIC has its own in-house counsel, (*see* Lib. Br. at 4), Phillips had no representation when he signed Blank Rome's engagement letter, (Lib. Br. at 16.) The Liberty Parties assert that this lack of representation—as well as a failure by Blank Rome to discuss the terms of the waiver language with him or disclose its "industry-wide representation practices"—shows that LBLIC did not give informed consent to waive future conflicts. (*Id.*)

But it is important to remember that the ultimate inquiry when evaluating whether a client gave informed consent is whether the disclosure provided by the firm is "reasonably adequate to allow a client to understand the material risks involved." *Galderma*, 927 F. Supp. 2d at 403 (citing Model Rules of Prof'l Conduct R. 1.0, cmt. 6 & R. 1.7, cmt. 22 (2023)). The presence of another lawyer representing the client, "familiar with the ethical requirements of practicing law," is a very strong indication that informed consent was given. *Id.* But this does not mean that the absence of independent counsel renders informed consent impossible. The Model Rules recognize that the "more experienced the client is" as a user of the legal services involved, "the less information and explanation is needed for a client's

consent to be informed." *Id.* at 397. The Court is persuaded that in this case—dealing directly with the legally experienced Phillips, who acted on behalf of LBLIC, a sophisticated client with attorneys of its own that had previously retained another large law firm for the same kinds of transactions—Blank Rome's disclosed waiver language in the April 2025 engagement letter was reasonably adequate to allow its client to understand the risks of waiving future conflicts.

The other key difference between this waiver and the one in *Galderma*, according to the Liberty Parties, is that the law firm in that case disclosed its "industry-wide representation practices, including specific representation of generic-drug manufacturers adverse to the client." (Lib. Br. at 16 (citing 927 F. Supp. 2d at 392, 396).) Blank Rome, the argument goes, did not adequately inform LBLIC of the potentially adverse clients they were likely to represent. This is unavailing. The actual "disclosures" made by the firm in *Galderma* regarding their potentially adverse representations are no more detailed than the general waiver language found in Blank Rome's April 2025 engagement letter. *See* 927 F. Supp. 2d at 393.

### b. The two representations are not substantially related.

The Court is satisfied that LBLIC gave informed "consent to any conflict of interest" stemming from Blank Rome's representation of adverse clients in legal matters "not substantially related to this representation." (Lib. App. 14.) But the Liberty Parties contend that, even under the terms of this waiver language, Blank Rome must be disqualified because this case is substantially related to the firm's

representation of LBLIC.  (Lib. Br. at 16–17.)  Because Blank Rome has carried its burden to demonstrate informed consent, the burden now shifts back to the Liberty Parties, as "the part[ies] seeking disqualification," to prove "that the present and prior representations are substantially related."  *In re Am. Airlines*, 972 F.2d at 614 (citation omitted).

"A substantial relationship exists when the prior representation concerns the particular practices and procedures which are the subject matter of" this lawsuit. *John Crane Prod. Sols., Inc. v. R2R and D, LLC*, No. 3:11-CV-3237-D, 2012 WL 3453696, at *2 (N.D. Tex. Aug. 14, 2012) (cleaned up).  "A substantial relationship may be found only after the moving party delineates with specificity the subject matters, issues and causes of action common to prior and current representations and the court engages in a painstaking analysis of the facts and precise application of precedent."  *In re Am. Airlines*, 972 F.2d at 614 (cleaned up). Blank Rome's representation of LBLIC does not need "to be 'relevant' in the evidentiary sense to be 'substantially related'" to the matter at hand.  *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1341, 1346 (5th Cir. Unit A Oct. 1981), *abrogated in part on other grounds by Gibbs v. Paluk*, 742 F.2d 181 (5th Cir. 1984).  Rather, it is enough for it to "be akin to the present action in a way reasonable persons would understand as important to the issues involved."  *Id.*

LBLIC retained Blank Rome to serve as lender's counsel in a transaction with You Drive Finance ("YDF").  (Resp. to Lib. at 2.)  This transaction (the "YDF2

Transaction") provided YDF with "structured warehouse financing for separate portfolios of non-prime automobile loans originated by YDF." (Dkt. No. 37-1 at 2.) After closing of the YDF2 Transaction, many of YDF's assets were acquired by Bravo Companies, Inc. ("Bravo"). (*Id.*) LBLIC then made a similar transaction with Bravo (the "Bravo 3 Transaction"), providing financing for a portfolio of non-prime automobile loans originated by Bravo, with Blank Rome once again serving as lender's counsel. (*Id.*) Blank Rome partner Mark Harris represented LBLIC in these matters, performing similar tasks for both transactions: conducting due diligence, drafting and negotiating loan documents on behalf of LBLIC, reviewing opinion letters from opposing counsel, and reviewing other borrower deliverables. (*Id.* at 2–3.) In a sworn declaration, Harris attests that the YDF2 and Bravo 3 Transactions were the only two transactions for which he represented LBLIC. (*Id.* at 3.) The Liberty Parties agree that Blank Rome's initial retention was with respect to these automobile loan financing transactions, but they assert that the representation quickly grew to encompass "negotiation and mediation of borrower defaults, communications with servicing agents, bankruptcy advice relating to secured financings, and loan and collection strategies and deal structuring." (Lib. Br. at 4.)

The Liberty Parties contend that Harris's representation of LBLIC in the YDF2 and Bravo 3 Transactions is substantially related to this case, because "they involve the same NDA, the same Protected Information, and the same Phillips Related Parties on both sides." (*Id.* at 16–17.) Ignore for a moment the facts that the

Liberty Parties provide scant evidence to support their allegation that Harris's representation expanded beyond the two financing transactions, *see M-I LLC v. Stelly*, No. 4:09-CV-1552, 2010 WL 2196281, at *6 (S.D. Tex. May 26, 2010) (finding "vague descriptions" and "oblique references" to billing records and subject matters insufficient to "establish a substantial relation between two representations"), and that, even taking their account of the representation as fact, it is not clear that any information Harris learned or work he performed—more than four years after Moos was terminated from Pillar and TCI—falls under the NDA's definition of "Protected Information," (*see* TCI App. 192 (defining "Protected Information" as any information, relating to the Phillips Related Parties, "provided to, made available to, or otherwise Acquired or learned by Moos")).  Were the Court to accept as true the Liberty Parties' premise that Harris's prior representation directly concerned core Protected Information under the NDA, there would still be far too tenuous a connection between that representation and the case at hand to show a substantial relationship.

A review of case law applying the substantial relationship test supports this conclusion.  In *Staneff v. Onsite Health Diagnostics, LLC*, No. 3:25-CV-353-B, 2025 WL 1908168, at *1 (N.D. Tex. June 10, 2025), the plaintiff, Staneff, sued Onsite Health Diagnostics, LLC ("OHD") for failing to pay him when he was an employee and part-owner of OHD, retaining as his attorney for the case the company's former general counsel, the Coles Firm.  During its prior tenure as general counsel, the

Coles Firm had advised OHD on general employment matters as well as specific plans to reduce payments to OHD part-owners. *Id.* at *4. Because Staneff's claims were straightforwardly based on actions taken by OHD under the advisement of the Coles Firm, the court found a "textbook example of substantial relation." *Id.* at 4 (cleaned up).

In *John Crane*, the court found it "self-evident" that two trademark representations were substantially related when the strength of a particular mark was a central issue in both cases. 2012 WL 3453696, at *6. But the court explicitly noted that the mere fact that the representations involved the same area of law, or even the same trademark, was "insufficient to meet the substantial relationship test." *Id.* at *7 (citing *In re Am. Airlines*, 972 F.2d at 625). It was the specific issue common to both representations that made them substantially related. This high bar to substantial relationship was reiterated in *Finalrod IP, LLC v. John Crane, Inc.*, No. 7:15-CV-97-DAE, 2016 WL 866930, at *5 (W.D. Tex. Mar. 3, 2016), in which the court found that a firm's work prosecuting a patent was not substantially related to its later work defending a new party in an infringement lawsuit concerning the same patent. Because "validity and infringement are distinct issues, bearing different burdens, different presumptions, and different evidence," the court determined the two representations were not substantially related. *Id.* (cleaned up).

The Liberty Parties insist that the two representations are substantially related because "Harris's lender-side structured-finance work for [LBLIC] . . . concerned the

exact categories of confidential business strategy now squarely at issue in" this NDA enforcement action. (Lib. Reply. at 6.) But the actual issues at the heart of this litigation—whether Moos violated or repudiated the NDA—do not have any direct relation to Harris's work facilitating loan transactions for LBLIC, much less a substantial one. *See Stelly*, 2010 WL 2196281, at *6. Even under a broad reading of substantial relationship, the only point of connection between the two representations is the fact that Harris's work may fall under the protection of the NDA. Whether it does or does not qualify as Protected Information, however, will not be an issue in this case, because there is no claim from the Plaintiffs that Moos violated the NDA by disclosing information related to Harris's representation. A connection this flimsy is insufficient to establish a substantial relationship between "current and prior representations where the causes of action at issue are wholly distinct." *See Hutton v. Parker-Hannifin Corp.*, No. H-15-3759, 2016 WL 4140736, at *4–5 (S.D. Tex. Aug. 4, 2016) (finding no substantial relationship between a prior patent dispute and a contract dispute).

The Liberty Parties maintain that these representations must be substantially related, relying on Harris's March 16 email to Phillips in which he requested conflict waivers to allow Johansen to continue his representation in this "unrelated" matter. (Lib. App. 71.) Why else, the Liberty Parties reason, would Harris request a specific waiver, if not because he realized the general waiver language in the April 2025 engagement letter did not cover this conflict? (Lib. Br. at 17–18.) They argue that,

because Blank Rome sought specific consent and was refused, the general waiver language in the engagement letter cannot apply, and Blank Rome must be disqualified as a result. (*Id.*)  The Liberty Parties cite to *First NBC Bank v. Murex, LLC*, 259 F. Supp. 3d 38 (S.D.N.Y. 2017), for support, saying the court in that case reached this conclusion on "materially identical facts" to this case. (*Id.* at 17.)  A careful review of *First NBC Bank* makes clear that is simply not the case.

In *First NBC Bank*, Murex, LLC ("Murex") hired Holland & Knight LLP ("HK") for lobbying services.  259 F. Supp. 3d at 41.  The engagement letter Murex signed stipulated that HK was to provide them no legal services whatsoever; because the engagement was strictly limited to lobbying, there was no attorney-client relationship between Murex and HK, no possibility of a conflict emerging, and thus no need for the engagement letter to include a general waiver of future conflicts.  *Id.* at 43.  HK, the letter stated, "would not be prohibited from providing legal services to clients in unrelated legal matters that are adverse to you."  *Id.* at 43.  The problem for HK was that the firm soon exceeded the bounds of lobbying in the work it performed for Murex, creating an attorney-client relationship between the two.  *Id.* at 67.  The Liberty Parties frame *First NBC Bank* as a case where the court concluded that a conflict was not covered under an engagement letter's general waiver language because the firm later requested a specific waiver for the conflict and was refused (Lib. Br. at 17–18.)  In reality, there was no general waiver.  When Murex refused to sign a specific conflict waiver allowing HK to represent First NBC Bank in its suit

-53-

against them, there was no general waiver language HK could invoke in its defense. *First NBC Bank*, 259 F. Supp. 3d at 50–51.

*First NBC Bank* provides no support for the Liberty Parties' assertion that Harris's request for a specific waiver is a "binding admission that the advance waiver did not cover this conflict." (Lib. Reply at 3.)  In the requesting email itself, Harris still describes this matter as "unrelated" to the representation he provided to LBLIC. (Lib. App. 71.)  And it is not fundamentally inconsistent for an attorney, confident in his engagement letter's general, open-ended waiver, to still take the "cautious and prudent 'belt and suspenders'" approach, *Tango Transp. v. Healthcare Fin. Servs. LLC*, 322 F.3d 888, 892 (5th Cir. 2003) (citation omitted), and seek out an additional, specific waiver.  After all, "a specific waiver of a particular type of conflict has the greatest likelihood of being effective." *Galderma*, 927 F. Supp. 2d at 396 (citing Model Rules of Prof'l Conduct R. 1.7 (2023)).  Given the "severity of disqualification," the Court is not willing to take the mere fact of Harris's March 16 email as evidence that the general waiver of the engagement letter was ineffective and disqualification is required.  *In re ProEducation*, 587 F.3d at 300 (citation omitted).  The Liberty Parties have failed to carry their burden of showing that these representations are substantially related.

Failing this, the Liberty Parties argue that Blank Rome possesses confidential information, gained either through Harris's representation of LBLIC or Johansen's involvement with the document productions prior to the Moos deposition, triggering

a presumption of conveyance and use that necessitates disqualification of the entire firm.  (Lib. Br. at 18–19.)  But the "presumption" to which they refer only arises where the moving party has established a substantial relationship between representations; because the Court has found that the Liberty Parties have failed to show a substantial relationship exists between the two representations, there is no irrebuttable presumption that confidential information has been disclosed.  *See In re Am. Airlines*, 972 F.2d at 614.  The possession of confidential information can serve as an alternative basis for disqualification, *see id.* at 615, but only when the moving party is able to "identify the disclosures it made to its former attorney during its former representation and demonstrate that such disclosures are relevant to and jeopardized by its former attorney's current representation," *Hutton*, 2016 WL 4140736, at *6 (cleaned up).  Vague allegations that Harris acquired confidential information on LBLIC's "investment goals and strategies, its loan portfolio . . . and detailed internal financial information" do not raise a reasonable possibility that LBLIC's confidential information will be used in this case to its disadvantage.  (Lib. Br. at 4.)

### D.     Johansen's Coverage Under the NDA

The parties in this case vigorously disagree over whether Johansen is himself a "Moos Related Party" bound under the terms of the NDA, with much of the disagreement centering on the NDA's definition of that group to include Moos and "any officers, directors, members, managers, parents, subsidiaries, owners,

shareholders, principals, agents, direct or indirect affiliates, heirs, successors, and/or assigns." (TCI App. 215.)  The Liberty Parties argue that Johansen is a party to the NDA as an "agent" of Moos.  (Lib. Br. at 21.)  They further contend that, by facilitating Moos's production of Protected Information in connection with the Moos deposition, Johansen violates the NDA, providing an independent ground for his disqualification from this case.  (*Id.* at 20–21.)  Moos argues that the absence of both Johansen's name and the word "attorney"—used elsewhere in the NDA—in the definition of "Moos Related Parties" indicates that it was never meant to reach Johansen.  (Resp. to Lib. at 19–20.)  Regardless, the Court need not determine this issue now.

Suppose that Johansen is a covered party under the NDA.  For Johansen to violate the NDA as the Liberty Parties allege—by his assistance to his client—Moos necessarily must have violated the NDA himself.  And whether or not Moos has or is about to violate the NDA is the issue at the very heart of this case, an issue that turns on as-of-yet unresolved questions, such as the validity of the subpoena duces tecum and the true source of the documents Moos produced from his storage bins. Plaintiffs have not yet carried their burden of establishing any of these issues, and it would be illogical for the Court to determine now, on a motion to disqualify, whether a breach has occurred, when it would have the practical effect of resolving the entire dispute.  Setting even that aside, the Liberty Parties fail to elucidate why exactly Johansen's violation of the NDA would require his disqualification.  The

Liberty Parties argue that Johansen's actions in violation of the NDA make his continued involvement in this case so "ethically untenable" that his disqualification "is necessary to protect the integrity of these proceedings." (Lib. Br. at 21.)  But they cite no precedent or ethical rules that support this basis for disqualification, and they provide no explanation as to how Johansen's violation of the NDA would create an actual prejudice in this lawsuit, where they accuse his client of the same conduct. "[The Liberty Parties] cite no authority for this theory, and [the Court] will not root about in the case law seeking support for it." *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1296 n.16 (5th Cir. 1994).

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs Pillar and TCI's Motion to Disqualify Mark Johansen and Blank Rome (Dkt. No. 51) and Plaintiffs Villager FWB, Farnham PATX, and Phillips's Motion to Disqualify Johansen and Blank Rome (Dkt. No. 54) are **DENIED**.

**SO ORDERED** on July 28, 2026.

_____
BRIAN McKAY
UNITED STATES MAGISTRATE JUDGE